**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| MARK SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-276 PS |
| | ) | |
| THE CITY OF EAST CHICAGO, | ) | |
| INDIANA; and GEORGE PABEY, | ) | |
| Individually and in his official capacity as | ) | |
| Mayor of East Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

When citizens go to the polls and exercise their franchise, the results of the election should matter. If it votes for change, the public has a right to expect it. Otherwise, what's the point? This case resulted from the bruising mayoral battle between incumbent Mayor Robert Pastrick, one of the longest serving mayors in the history of the country, and upstart George Pabey. Both were vying for the office of mayor of East Chicago in Indiana. Pabey upset Pastrick in the hotly contested election and, as a result, several of Pastrick's department heads were shown the door. One of those who was dismissed was Plaintiff Mark Sanders. He was fired from his job as Director of the Human Rights Department for the City of East Chicago. Sanders filed suit against both Mayor Pabey and the City, alleging that he was fired because of his political support for Pastrick. This matter is now before the Court on Defendants' Motion for Summary Judgment. Because Sanders occupied a "policy-making" position, it was permissible for him to be fired. The Motion for Summary Judgment is therefore granted.

## I.  FACTUAL BACKGROUND

In May 2003, George Pabey ran against incumbent mayor Robert Pastrick in the Democratic primary for mayor of East Chicago.  (Pabey Dep. at 6-7, Defs. Ex. B & Pl. Ex. 6.)  Pastrick defeated Pabey in this primary, but due to voting fraud, the Indiana Supreme Court voided the primary election result.  (*Id.* at 7-8; *Pabey v. Pastrick*, 816 N.E.2d 1138, 1151 (Ind. 2004).)  Pabey then defeated Pastrick in a special primary held in October 2004 and subsequently won the general mayoral election in December 2004.  (Pabey Dep. at 8.)

Pastrick had hired Plaintiff Mark Sanders in February 2004 to serve as Director of the Human Rights Department for the City.  (Sanders Dep. at 14, Pl. Ex. 3.)  During the special primary election, Sanders supported Pastrick by passing out literature, attending meetings and fundraisers, placing yard signs, and financially contributing to Pastrick's campaign.  (*Id.* at 43-45, 48.)  Pabey admits that he knew that Sanders supported Pastrick during the special primary.  (Am. Answer ¶ 8, Pl. Ex. 2.)  Charles Pacurar, the City Controller for Pabey's administration, assumed that Sanders was a Pastrick supporter, apparently because Sanders was a department head in Pastrick's administration.  (Pacurar Dep. at 5, 27, Defs. Ex. C & Pl. Ex. 5.)

Before winning the mayoral election, Pabey and Pacurar discussed the qualifications of the various department heads.  (Pabey Dep. at 11-12; Pacurar Dep. at 27-29.)  Pabey and Pacurar decided that, if Pabey was victorious, all department heads they considered "unqualified" – and this included Plaintiff Sanders – would be removed from their positions.  (Pabey Dep. at 11-12; Pacurar Dep. at 27-28.)  Pabey believed Sanders was unqualified because Pabey often saw Sanders driving around the City during the work day.  (Pabey Dep. at 16.)  Pacurar considered Sanders unqualified because of his past work experience at a casino, even though Pacurar did not

2

know what Sanders actually did at the casino. (Pacurar Dep. at 29.) Neither Pabey nor Pacurar looked at Sanders' personnel file with the City before making this decision. (Pabey Dep. at 13; Pacurar Dep. at 29-30.)

Pacurer also criticized Sanders' performance as the Director of the Human Rights Department, specifically his handling of complaints and his oversight of outside contracts. (Pacurer Dep. at 30.) Pacurer noted that the Director was in charge of taking citizen complaints of human rights violations and ensuring that city contractors were complying with minority hiring. (*Id.*) Nevertheless, in 2004, the Department had only 91 cases, and didn't do any investigative work on the City contracts. (*Id.* at 31-32.) Instead, an outside firm contracted by the Human Rights Commission performed this task. (*Id.* at 32.) Pacurer therefore believed that Sanders was doing a poor job because the work was outsourced – work that should have been done by Sanders himself or by members of his department who, after all, were already getting paid to do it. (*Id.* at 33.) Former Mayor Pastrick, on the other hand, found that Sanders was performing his job duties satisfactorily, and wrote a letter to Sanders to that effect. (Pastrick Letter, Pl. Ex. 7.)

In December 2004, following Pabey's orders, Pacurer terminated Sanders, and told him that the Director position was being eliminated. (Sanders Dep. at 32-33, 36; Pabey Dep. at 14.) In truth, Sanders was replaced by Pabey supporter Robert Florence for approximately a month. (Pacurar Dep. at 34; Pabey Dep. at 19-20.) Cleotis White then took over the position in March 2005. (C. White Aff. ¶ 2, Defs. Ex. H.)

On July 15, 2005, Sanders filed a complaint under 42 U.S.C. §1983, alleging that he was terminated as payback for supporting incumbent Mayor Pastrick during the special primary.

3

Specifically, Sanders asserts that he was unlawfully discharged for protected political activity in violation of the First and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Indiana Constitution.

The critical question is whether Sanders held a policy-making or confidential position. If he did, then his dismissal by the new mayor was perfectly permissible. Thus, while tedious, we must describe the nature of Sanders' job in order to answer the central question posed by this case.

### A. Director of the Human Rights Department's Duties and Responsibilities

The City drafted an official job description for the position of Director of the Human Rights Department. (Job Description (EC 2596-2597), Defs. Ex. I.) In general, the Director:

> is responsible to the Mayor and the Human Rights Commission for directing, planning and administering departmental operations and activities in accordance with the currently effective Human Rights Ordinance and to investigate, determine validity and pursue all valid discriminatory charges to the proper conclusion or settlement efficiently and expeditiously.

(*Id.* at EC 2596.) Specifically, the Director directs the activities and operation of the Department, which includes supervising all personnel, establishing staff requirements and budget controls, and directing staff in the maintenance of the Department's documents. (*Id.* at EC 2596-97.) The department consists of five staff members: a director, a case monitor, an investigator, an Equal Employment Opportunity Commission (EEOC) liaison, and a secretary. (C. White Aff. ¶ 3; Sanders Dep. at 26, 30-31.)

The Director also acts as a liaison for the Mayor and the City with federal, state, regional and city civil rights groups. (Job Description at EC 2596.) He attends meetings and seminars in

4

an advisory capacity or as a representative of the City at various government-level functions concerning human rights. (*Id.* at EC 2597.) Furthermore, he confers with and advises the Human Rights Commission and other municipal, state and federal officials on regulatory policies and procedures. (*Id.* at EC 2596.) He performs additional outreach duties such as: providing designated authorities with recommendations, studies, records, historical materials, and new and revised programs designed to provide and protect the equal rights and opportunities of all citizens of the City; directing or conducting field visits to determine policies and practices among employers to determine compliance with orders issued by the Human Rights Commission or applicable ordinances; initiating investigations to assure that firms conducting business within the City are following non-discriminatory hiring and promotion policies and advising employers of City policy and procedure in this regard; initiating and monitoring the City's Affirmative programs and submitting recommendations regarding current and proposed programs; conducting continuous public education to outline goals and establish reasonable objectives for the Department; and finally, providing counseling services and assistance to community groups and individuals. (*Id.* at EC 2596-2597.)

In addition to the above duties, the job description also states that the Director receives complaints alleging discrimination and conducts the necessary inquiries and investigations, or directs his staff to do so, to determine the validity of a charge of discrimination. (*Id.* at EC 2596.) He then compiles the findings and reports them to the Human Rights Commission with recommendations for action. (*Id.*) Based on the decided course of action, he may attempt to resolve problems through conciliatory, persuasive and other appropriate methods, such as referring cases to counsel for possible court action when appropriate. (*Id.*) He also may direct

whatever action may be required to correct valid complaints of unfair employment practices of employers, employment agencies, and labor organizations.  (*Id.*)  Lastly, he controls distribution and use of federal funds granted to support human rights programs for the Department.  (*Id.*)  The job description ends with a catch-all responsibility: the Director "perform[s] other duties as directed by the Mayor."  (*Id.*)

Mayor Pabey has not changed this job description since he took office.  (Pabey Aff. ¶ 8 Defs. Ex. D.)  Richard Gomez, the City's Human Resources Department Manager, noted that this job description has not been changed since at least July 2001 and therefore was in force during Sanders' tenure from February 2004 through December 2004.  (R. Gomez Aff. ¶¶ 2, 5, 6, Defs. Ex. J.)  The Human Rights Investigator, Gene Miller, who has been employed in his position since 1985, reports to and works with the Director of the Human Rights Department.  (G. Miller Aff. ¶¶ 2, 4, Defs. Ex. K.)  After reviewing the job description, Miller provided an affidavit stating that the job description accurately describes the Director's duties and responsibilities as it existed during Miller's employment as the Investigator, including when Sanders served as the Director.  (*Id.* at ¶ 5.)  Likewise, the current Director of the Human Rights Department attested that the job description provided by Defendants accurately describes her duties and responsibilities and has not been changed since she became the Director.  (C. White Aff. ¶¶ 5, 6.)

Sanders claims that he never actually received a copy of the job description and was not aware that an official description existed.  (Sanders Dep. at 117.)  Instead, he was walked through the tasks of his job by his staff members and was told by the Human Rights Commission what was expected of him.  (*Id.* at 117-18.)

Though Sanders claims he never received the job description, his testimony regarding his responsibilities as the Director of the Human Rights Department largely tracks the written description.  He stated that he oversaw the staff and day-to-day operations of the Department and ensured that the City was abiding with EEOC contracts.  (Sanders Dep. at 16-17; *see also id.* at 84 (noting that he was responsible for "day-to-day activities making sure that the policies and the procedures were followed . . . ; making sure that the laws and the ordinances of the city pertaining to human rights . . . were followed through; making sure that we were in compliance with our contract with the EEOC").)  This included conducting both staff and individual meetings to discuss the Department generally, to review staff's job performance, and to obtain feedback.  (*Id.* at 28, 53.)  Sanders discussed his desire to implement "cross-training" in his department where more than one staff member would be trained in investigating complaints and in interacting with the EEOC.  (*Id.* at 29-30.)  The Commission approved his suggestion, but its implementation was not completed by the time he left.  (*Id.* at 118-19.)  He also reviewed the investigator's work, asked questions and raised any concerns regarding the cases, and was kept informed of their status.  (*Id.* at 22, 104-05.)

Sanders attended biweekly departmental meetings with the Mayor where he and other departmental representatives presented and listened to reports about departmental activities.  (*Id.* at 17-18.)  He also met with the city controller and city council members to discuss the budget for his Department and to answer any questions.  (*Id.* at 25, 135-37.)  Additionally, Sanders interacted with outside agencies, such as the EEOC, HUD (Housing and Urban Development), and the Indiana Human Rights Consortium.  (*Id.* at 31.)  He noted that in the past his Department held events and seminars and that he and his staff wanted to inform and educate the public.  (*Id.*

7

at 115.)  However, he never had the opportunity to do so because of his short tenure.  (*Id.*)

In apparent contrast to some of his deposition testimony, Sanders submitted an affidavit discussing his negligible input in dealing with outside contracts.  He stated:

> When I was hired, the Board of Public Works had a contract already in place with an outside consulting firm to review various contracts that the City had entered with various vendors and contractors, for the purpose of EEO compliance, and to assist in rewriting the City Ordinance with regard to minority hiring and local resident hiring pertaining to contracts with the City of East Chicago.
>
> Although I was aware of the work performed by the consulting firm, I did not have any input in the fact the City, through the Board of Public Works, had entered into the contract with the consulting firm, nor did I have oversight over the consulting firm, as the consulting firm reported to the Commission as to its work.

(Sanders Aff. ¶¶ 2-3, Pl. Ex. 4.)

### B. Human Rights Commission

The Director of the Human Rights Department works closely with the Human Rights Commission, which is composed of seven members of the community who are appointed by the mayor for a three-year term.  (Am. Answer ¶ 7; C. White Aff. ¶ 3.)  The Commission's primary responsibility is to "hear and resolve discrimination disputes at a monthly meeting."  (C. White Aff. ¶ 3.)  The Commissioners' powers and duties are established by ordinance Chapter 2.56 of the East Chicago Municipal Code.  (§ 2.56, Pl. Ex. 8.)  In general, the Human Rights Commission has the power to conduct hearings on complaints of discrimination, make findings based on those hearings, issue cease and desist orders, order payment of damages (including costs and attorney fees), and institute actions in Indiana courts of general jurisdiction.  (*Id.* at § 2.56.270.)  Furthermore, the Commission can adopt rules and regulations, conduct programs and

activities relating to human rights, publish the results of investigations and research regarding discrimination, and formulate policies regarding human rights and make recommendations to the City to effectuate such policies. (*Id.*)

Sanders in his deposition described his working relationship with the Human Rights Commission. He testified that he reported to the Commissioners and generally met with them monthly. (Sanders Dep. at 19, 26.) He (along with his investigator) presented evidence to the Commission regarding the cases they were investigating. (*Id.* at 20.) Sanders then offered recommendations regarding the disposition of the cases. (*Id.* at 22-23.) The Commission could either agree or disagree with the recommendations, request that evidence be presented directly to it or decide that more evidence is needed. (*Id.* at 23, 88-89.) Sanders also presented evidence on different contractors who were seeking business with the City or on existing City contractors' compliance with non-discriminatory hiring practices. (*Id.* at 20, 86-87.) The Commission would subsequently decide on whether to offer or to continue the contracts, or the Commission itself could choose to interview the contractors. (*Id.*) If issues arose regarding the City's EEOC contract or the human rights ordinances, Sanders would report them to the Commission, which would provide direction. (*Id.* at 84.) Additionally, Sanders reported on departmental day-to-day activities. (*Id.* at 89.)

Finally, Sanders testified that the Commission sometimes gave him assignments. For example, if the Commission noted that several cases originated from a particular company, it may ask him to research why that company was having such problems. (*Id.* at 101-02.) After Sanders had completed this work, he would make his recommendations to the Commission, which then would act as it saw fit. (*Id.*)

## II.  DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party."  *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

### A.     Sanders' First Amendment Claim

Defendants argue that they are entitled to summary judgment on Sanders' First Amendment claim because Sanders held a policy-making position and that gives them to the absolute right to discharge him.[1]  We agree with Defendants and find that the Director of Human Rights is a policy-making position that allows the mayor to terminate the occupant even if the reason for the dismissal is pure politics.

Although the First Amendment protects public employees from suffering adverse job actions because of their political beliefs and associations, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 69-71 (1990), an "exception to this general rule is permitted when the government

---

[1] Defendants also contend that there is no evidence that Sanders' support for Pastrick was a motivating factor in his discharge and that Sanders cannot refute that their tendered reason for discharge is legitimate and non-political.  Because we find that Sanders' position is exempt from First Amendment protection and thus he may be discharged on political grounds, we need not discuss the remaining reasons raised by Defendants.  We also need not analyze whether the reason given by Pabey for firing Sanders is a legitimate one.

employee responsible for the adverse action can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (citing *Branti v. Finkel*, 445 U.S. 507, 517-18 (1980)).

Courts typically refer to this exception as the "policy-making" or "confidential" employee exception because those terms fit the majority of situations where the exception applies. *Id.* The ultimate inquiry, however, is not whether the job fits the label of "policymaker" or "confidential," but whether party affiliation is an appropriate requirement for effectively performing the job. *See Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 756 (7th Cir. 2002).

The reason for the policy-maker exception is obvious. Elections have consequences and when a new administration takes over, the head of that administration has the right to expect loyalty from those who occupy key positions in his administration. So when the people of East Chicago ousted the long-term incumbent in favor of change, the new mayor had the right to fill certain positions with people who would support his views. After all, that's what got him elected in the first place.[2] Why conduct elections if the prevailing candidate could not implement the policy changes that he promised in his campaign? *See Walsh v. Heilmann*, 472 F.3d 504, 506 (7th Cir. 2006).

---

[2] We note that the law regarding patronage dismissal applies when one faction of a party replaces another faction of the same party. *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir. 1985). Thus, it is irrelevant to our analysis that both Pabey and Pastrick belong to the Democratic party.

11

The difficult question is which jobs are politically sensitive enough to override the First Amendment protection and which are not. This inquiry can get murky, but the Seventh Circuit says that it must be "determined by a functional test that examines the powers and duties inherent in the position." *Carlson*, 374 F.3d at 464 (citing *Hudson v. Burke*, 913 F.2d 427, 431 (7th Cir.1990)). We examine whether the position "involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or . . . gives the holder access to his political superiors' confidential, politically sensitive thoughts." *Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005), *cert. denied*, 126 S.Ct. 1793 (2006) (citations omitted). We also will consider "the degree of discretion and responsibility exercised in the position." *Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006) (citations omitted). Finally, we look at "whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Thompson*, 300 F.3d at 756 (citation omitted). Relying on labels that describe a job is discouraged. *Id.* Rather, if a position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation," it will be found to involve policymaking. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005) (citation omitted).

To determine the powers and duties inherent in a position, we must review the official job description, if one is provided. *See Allen*, 460 F.3d at 944. Such an inquiry "presents a question of law informed solely by the job description and the powers of office." *Riley*, 425 F.3d at 361 (citation omitted). Courts are permitted to look past the description only if the plaintiff demonstrates "systematic unreliability." *Allen*, 460 F.3d at 944. To fulfill this standard, he "must provide specific facts demonstrating that the description was unreliable and

12

unauthoritative." *Id.*  For instance, he must show that the description has been manipulated. *Id.* Thus, "we look to see how the description was created and when, and how often [] it was updated." *Id.*

In this case, the Court finds that political affiliation is an appropriate requirement for the position of the Director of the Human Rights Department.  This decision is primarily based on the official job description provided by Defendants. *See id.* at 944-45 (looking "solely to the job description to determine if political affiliation is an appropriate job requirement" when the plaintiff did not argue that the description is unreliable).  This description reflects that the Director exercises considerable political judgment, particularly relating to the direction and operation of the Department, the handling of federal funds, and the making of recommendations to the Commission based on investigations performed by his staff.

Furthermore, the Director represents the Human Rights Department in public when he interacts with the Human Rights Commission, employers, governmental agencies, civil rights groups, and the citizenry at large. *See Selch v. Letts*, 5 F.3d 1040, 1047 (7th Cir. 1993) (finding that superintendent position was exempt from First Amendment protection where he "was a critical and highly visible representative of the state administration and was required to exercise discretion in meeting the needs of public officials and a large number of the electorate."); *Harney v. McDermott*, No. 2:04-CV-131, 2006 WL 1544389, at *9 (N.D. Ind. June 2, 2006) (finding that plaintiff was a policymaker where he had authority to speak for his department and attended meetings on behalf of the department).  Such a role requires political sensitivity and judgment and can reflect either favorably or poorly on the elected officials. *See Bonds v. Milwaukee County*, 207 F.3d 969, 977 (7th Cir. 2000) ("For those sensitive government

positions, termed "policymaking" jobs, the government employer has a heightened need for trust and confidence that its subordinates are guided by the same political compass and will exercise their discretion in a manner consistent with their shared political agenda.").

Sanders has not argued that the job description was unreliable or manipulated in any way. Nor can he. The evidence demonstrates that the official job description was created before 2001 and had not been modified by Pabey after his election as mayor. Instead, Sanders argues that he never received the job description and was not aware that an official one existed. That does not matter. The new mayor and his administration are allowed to rely on the official job description when figuring out who is not protected from political dismissal, provided they can show that the description is objective. *See Riley*, 425 F.3d at 365. They have done so here via affidavits from the City's Human Resources Department Manager, the Human Rights Investigator, and the current Director of Human Rights.

To further bolster the Court's holding, Sanders himself testified about his discretion and responsibility as the Director. He conceded that he oversaw his staff and day-to-day operations, offered recommendations to the Commission regarding the disposition of cases, performed investigations at the request of the Commission, and attended departmental and budget meetings on behalf of his Department. *See Allen*, 460 F.3d at 945-46 (noting that the Court must examine whether the position has "***input*** into government decisionmaking") (emphasis in original).

Despite this testimony, Sanders in his Response downplays his responsibilities stating that he merely performed administrative tasks. (Pl. Resp. at 10.) But this assertion is at odds not only with his own testimony but also with the job description. Regardless, even if Sanders "perform[ed] fewer or less important functions than usually attend his position, he may still be

14

exempt from the prohibition against political terminations if his position inherently" includes policy-making tasks. *Kiddy-Brown*, 408 F.3d at 355. Such is the case here. The job description demonstrates the discretion and policy-making duties inherent in the Director position such that party affiliation is an appropriate requirement for this job. *See Thompson*, 300 F.3d at 756 ("[W]e look at the nature of the responsibilities and focus on the duties inherent in an office, and not the functions of the position performed by a particular person.").

The district court in *Raker v. City of Charleston* faced a nearly identical factual scenario to the situation before us. 782 F. Supp. 308 (S.D. W. Va. 1992). The Executive Director of the Human Rights Commission was terminated by the newly elected mayor. *Id.* at 310. The court noted that the Director made recommendations, conducted training sessions and outreach programs, and worked closely with governmental entities. *Id.* at 312. It thus held that political affiliation is a qualification for the Executive Director's position. *Id.* The court reasoned:

> The function of the position of Executive Director of the Charleston Human Rights Commission is of a politically sensitive nature. There is great room for political disagreement on the goals and their implementation under the Charleston Human Rights Commission. The Executive Director influences the pace of government by deciding what types of cases to pursue more aggressively than others. The Executive Director is also a communicator and decision maker within the *Elrod-Branti* analysis. The interaction of the Executive Director with so many citizens and various governmental agencies places the Director in a significant position for representing the administration's public image.

*Id.* The Court agrees with the analysis in *Raker*, and consequently, party affiliation is an appropriate requirement for the Director position.

Sanders' predominant argument is that he is constrained by the Commission's decisions, must report to them on substantive matters, and it, rather than he, has the real policy-making powers as provided by municipal ordinance. (Pl. Resp. at 10.) This all may be true, but the "remaining discretion" retained by the Director "is enough to make it important that the office be held by someone with [the] elected [official's] confidence." *Walsh*, 472 F.3d at 506.  To show just one example – the Director makes recommendations to the Commission about its course of action relating to a specific complaint. There is nothing in the record to suggest that the Commission does not value this recommendation coming from the Director, who is intimately familiar with the facts of each case. Such recommendations can have a major impact on how the citizens of a city view their leaders' stance on, for example, minority hiring and affirmative action. *See Neff v. Hmurovich*, 261 F. Supp. 2d 1026, 1038 (S.D. Ind. 2003) (noting that "[a]lthough [the] positions reported to others in a hierarchy and [] implemented policies from higher authorities, [the positions] also had sufficient oversight and control over their respective entities and sufficient meaningful input into the policy-making process that [they] were found to be policy makers") (citing *Warzon v. Drew*, 60 F.3d 1234, 1235 (7th Cir. 1995) and *Vargas Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 972 (7th Cir. 2001)).

Moreover, as we have previously stated, the Director supervises the investigation of complaints, directs such action that may be required to correct discriminatory behavior, and implements the decisions instituted by the Commission. Such responsibilities (as listed in the job description) and the manner in which they are carried out "are judgmental, policy-oriented, and politically sensitive." *Riley*, 425 F.3d at 363; *see also Thompson*, 300 F.3d at 757 (noting

16

that directing staff, formulating procedures, advising committees, developing goals, and directing and implementing a budget all amount to a policy-making position).

Sanders also points out in his declaration that he was not involved in dealing with outside contractors' compliance with EEOC policies as a consulting firm was hired for that task. These statements in his declaration contradict his deposition testimony where he explicitly stated that he presented evidence to the Commission regarding outside contractors either already working with the City or seeking City contracts. Thus, we need not even consult his affidavit to the extent that it contradicts his earlier deposition testimony. *See Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005). But even taking into account the affidavit, the delegation of this task to another entity does not diminish the discretion and authority inherent in the Director position.

Finally, Sanders argues that the municipal ordinance does not extend any powers and duties to the Director who is appointed by the mayor, whereas it establishes broad powers to the Commission. (Pl. Resp. at 11.) As a corollary, he claims that this appointment power of the mayor contravenes Indiana law, specifically I.C. 22-9-1-12.1(c)(10), which authorizes the local agency (in this case, the Human Rights Commission) to appoint its executive director rather than the mayor. (*Id.*)

The Court does not dispute that the ordinance expressly gives policy-making duties and powers to the Human Rights Commission. But this delegation of power does not defeat Defendants' argument that the Director of the Human Rights Department has certain responsibilities that require the "exercise of political judgment." These responsibilities are enumerated in the job description rather than the ordinance. We don't understand Sanders' claim that this nevertheless creates an issue of material fact. It does not. *See Riley*, 425 F.3d at

17

361 (noting that either a reliable job description or a position clearly described by statute poses a question of law to the court to be resolved at summary judgment).

We also are confused by Sanders' assertion that the Commission rather than the mayor should select the Director pursuant to Indiana law. Maybe there is a violation of Indiana law here, but that issue is not before us. Under federal constitutional law, Sanders may be fired on the basis of his political affiliation as he exercised policy-making duties in his Director role. Thus, regardless of whatever violation may have occurred under Indiana law, Sanders' federal constitutional rights have not been violated.[3] *Cf. Riley*, 425 F.3d at 365.

Mayor Pabey and his Controller appear, at least based on the record before the Court, to take the issue of human rights and employment discrimination in East Chicago seriously. Controller Pacurer noted that the Department had not investigated many cases, at least in his opinion, and that he didn't believe Sanders was doing a proper job as Director. It makes political sense that a mayor would want to appoint a Director of the Human Rights Department who mirrored his own viewpoint regarding discrimination and human rights. *See Walsh,* 472 F.3d at 505 ("[T]he first amendment does not block an elected official from appointing someone who shares his view about enforcement priorities."). Accordingly, for all the above reasons, Defendants' Motion for Summary Judgment as it relates to Sanders' First Amendment claim is granted.

---

[3] The Court notes that the Indiana Code 22-9-1-12.1(c)(10), which Plaintiff cites, simply states that "an ordinance adopted under this section *may* grant to the local agency the power to: employ an executive director and other staff personnel." (emphasis added).

### B.      Sander's Fourteenth Amendment Claim

Sanders alleges in his complaint that his termination was in violation of the Due Process clause of the Fourteenth Amendment. The Seventh Circuit has set forth the standard to establish a due process claim: Sanders must demonstrate that: (1) he had a constitutionally protected property interest; (2) he suffered a loss of that interest amounting to a deprivation; and (3) the deprivation occurred without due process of law. *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Protected property interests in employment "can arise from a state statute, regulation, municipal ordinance, or an express or implied contract." *Kiddy-Brown*, 408 F.3d at 360. Thus, we look to Indiana law to determine whether Sanders has a property interest in his employment with East Chicago. The Indiana code provides that a city "executive may suspend, remove from office any officers, deputies, or other employees of the city appointed by the executive or a prior executive, by notifying them to that effect . . . ." I.C. 36-4-11-2(d).

Sanders has not pointed to an independent state law ground for his alleged protected property interest. In fact, he did not respond to Defendants' motion for summary judgment as to this claim. Accordingly, Defendants' Motion for Summary Judgment with respect to Sanders' Fourteenth Amendment claim is granted.

### C.      Sanders's Indiana Constitutional Claim

Sanders also raises a claim under Article I, Section 9 of the Indiana Constitution. We have granted summary judgment to Defendants on the federal claims in Sanders' complaint. In the Seventh Circuit, the usual practice is to dismiss state law claims whenever all federal claims have been dismissed prior to trial. *See* 28 U.S.C. § 1367(c)(3); *East-Miller v. Lake County*

19

*Highway Dept.*, 421 F.3d 558, 564 (7th Cir. 2005).  Accordingly, the Court dismisses without prejudice Sanders' state law claim.[4]

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE 32] is **GRANTED** with respect to Plaintiff's First Amendment and Fourteenth Amendment claims.  Plaintiff's state law claim is **DISMISSED WITHOUT PREJUDICE**.  The clerk is **DIRECTED** to terminate this matter.

**SO ORDERED**

ENTERED: May 21, 2007

> s/ Philip P. Simon
> PHILIP P. SIMON, JUDGE
> UNITED STATES DISTRICT COURT

---

[4] Defendants did not seek granting of summary judgment on Plaintiff's state law claim on its merits until their reply brief.  Instead, in their initial memorandum, they requested dismissal of the state law claim because the federal claims should be dismissed.  Plaintiff has not had an opportunity to respond to Defendants' arguments regarding the merits of his state law claim set forth in their reply.  Accordingly, the Court will dismiss the claim without prejudice.